**ORIGINAL**

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

INTERNET SECURITY SYSTEMS, INC., a Georgia
Corporation,

        Plaintiff,

    v.

SRI INTERNATIONAL, INC., a California Corporation,

        Defendant,

Civil Action No.
04-CV-2402-CC

0 5 - 4 0 5

## SRI INTERNATIONAL, INC.'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) AND MEMORANDUM IN SUPPORT

Defendant SRI International, Inc. ("SRI") moves the Court to dismiss Internet

Security Systems, Inc.'s ("ISS") Complaint for Declaratory Judgment filed on

August 17, 2004. The basis for this motion is set forth in the following: If the Court

is inclined to conclude that subject matter jurisdiction exists, SRI asks the Court, in

its discretion, decline to exercise that jurisdiction.

## I.   INTRODUCTION

While pretending to engage in good faith licensing discussions, Plaintiff

Internet Security Systems, Inc. ("ISS") secretly filed the present action against SRI

International, Inc. ("SRI"). It then continued to participate in license discussions in

which it sought to acquire information relevant to SRI's potential infringement and

validity positions, all the while concealing the fact that it had already sued SRI.

Because ISS lacked an objectively reasonable apprehension at the time it filed suit

that SRI was preparing to sue it for patent infringement, subject matter jurisdiction

over the present declaratory relief action does not exist, and SRI moves pursuant to

Fed. R. Civ. Pro. 12(b)(1) to dismiss ISS's Complaint for Declaratory Judgment

("Complaint") for lack of subject matter jurisdiction.

In addition, and although SRI believes the lack of jurisdiction is clear, SRI

submits that even if subject matter jurisdiction exists, the Court should decline to

exercise that jurisdiction in light of ISS's egregious and tactically-motivated

behavior. As will be demonstrated more fully below, the exercise of jurisdiction in

this case would not further the purposes of the Declaratory Judgment Act, and would

in fact undermine the important social objective of encouraging settlement and

conserving judicial resources.

## II.    FACTS

SRI is an independent, not-for-profit research institute. Founded in 1946 as the

Stanford Research Institute, SRI (separated from Stanford University since 1972)

works in cooperation with the government and the private sector to further basic

scientific research in such diverse fields as pharmaceuticals, medical devices,

education and public policy, homeland defense, and computer science. Beginning in

the 1980's, SRI was awarded a series of contracts by the Defense Advanced Research

Projects Agency ("DARPA") to develop technology to provide security, including

intrusion detection and prevention technology, needed to protect critical

governmental computer networks. Several of these contracts ultimately led to the

development of a sophisticated intrusion detection and prevention technology that is

disclosed and claimed in the SRI patents at issue in this action.[1]

As a result of its work for DARPA, and its subsequent development and

improvement of the initial technology developed under DARPA funding, SRI has

been awarded a number of patents related to network intrusion detection (the

"intrusion detection patents"). Under the terms of the Bayh-Dole Act, 35 U.S.C.

§ 200 *et seq.*, the federal government retains a license for government use of

technology developed by SRI under government funding. SRI, on the other hand,

retains all commercial rights to any patents resulting from the project. SRI uses

license revenues from its extensive intellectual property portfolio, in part, to further

additional fundamental scientific research.

In Spring of 2004, SRI embarked on a major licensing effort related to SRI's

intrusion detection patents. As part of this broad effort, SRI's Vice President of

Legal and Business Affairs and General Counsel, Richard H. Abramson, sent a letter

to Mr. Richard Macchia, Senior Vice President and Chief Financial Officer of

---

[1] Intrusion detection and prevention products gather and analyze information from network systems to detect and stop inappropriate, incorrect or anomalous activity and identify possible security breaches.

plaintiff ISS. [Abramson Decl., ¶ 2.][2] In the March 31 letter, Mr. Abramson

explained that several SRI patents were potentially relevant to certain ISS products.

[Exh. A, p. 2; all exhibits are attached to the supporting Declaration of Richard H.

Abramson.] Mr. Abramson mentioned that his contact with ISS was part of a broader

effort to license SRI's patents in the network security industry. The letter also

suggested that there might be only a narrow time window available to ISS to

negotiate, if ISS wanted to acquire exclusive rights to some or all of the relevant

intellectual property. Id.

After a follow-up letter from SRI, ISS contacted SRI through its outside

counsel, King & Spalding, on May 3 or 4, 2004. [Abramson Decl, ¶ 4.] ISS

suggested that, in order to move forward toward a potential business opportunity, ISS

would have to conduct its own analysis of the validity of the SRI patents. [Exh. D.]

In order to assist with ISS's due diligence and at ISS's request, SRI provided ISS

---

[2] Between March 31 and August 20, the parties exchanged correspondence as part of
their licensing negotiations. In some cases documents were exchanged pursuant to
F.R.E. 408. SRI references these documents, not to admit them to prove the
validity or amount of a claim, but only to establish the absence of subject matter
jurisdiction. See, Cohn v. Petsmart Inc., 281 F.3d 837, 840 fn.3 (9th Cir. 2002)
(admitting settlement offers to prove amount in controversy); Conmed Corp. v.
ERBE Electromedizin GmbH, 129 F. Supp. 2d 461, 467 fn.4 (N.D.N.Y. 2001)
(admitting settlement letter for limited purpose of impeaching the declaratory
judgment plaintiff's claim of reasonable apprehension of infringement suit.)

with copies of references cited during the prosecution of the intrusion detection patents. [Abramson Decl., ¶ 8.]

On June 24, 2004, ISS's attorney at King & Spalding, Mr. Scott Petty, ISS's General Counsel Sean Bowen, and an associate of Mr. Bowen's, Sheila Burks, called Mr. Abramson at SRI to express ISS's desire to engage in business discussions. [Abramson Decl, ¶ 10.] To that end, the parties scheduled a conference call for July 2, 2004. Id. In addition to the parties' attorneys, the conference call was to involve Bill Mark, Vice-President of SRI's Information and Computer Science Division, David Stringer-Calvert, Director of IP for Information Technology for SRI, and two intellectual property valuation consultants for ISS.

The July 2, 2004 conference call proceeded as planned. [Abramson Decl., ¶ 11.] During the call, the parties disclosed their relative positions on the value of a license for SRI's intrusion detection patents. Id. ISS asserted that it believed the patents to be invalid in light of certain prior art. Id. Although SRI believed its patents to be valid, in order to move the negotiations forward, ISS and SRI agreed that ISS would provide its prior art once a non-disclosure agreement was in place between the parties. Id. ISS also expressed a desire that SRI provide its infringement analysis regarding ISS's products. Id.

The parties worked steadily over the ensuing three weeks to arrive at a mutually satisfactory non-disclosure agreement ("NDA"). [Exh. H.]. Under the

terms of the NDA, SRI and ISS agreed that they would "enter into discussions and negotiations regarding a potential patent licensing arrangement and/or settlement of a dispute concerning [SRI's intrusion detection patents.]" Id. at ¶ 1. Toward the latter stages of the parties' negotiations regarding the NDA, the parties agreed to a July 22, 2004 teleconference to discuss SRI's licensing proposal. [Abramson Decl. ¶ 12.] On July 19, 2004, with the NDA in place, ISS sent SRI a letter in which ISS described certain allegedly prior art references and explained its position on them. [Abramson Decl, ¶ 13.] Because ISS's letter regarding validity arrived only three days before the scheduled July 22 conference call, the parties decided to delay the conference call to July 27, 2002. Id.

SRI responded to ISS's letter regarding the SRI patents. [Abramson Decl., ¶ 14.] Thereafter, the July 27, 2004 conference call proceeded as planned. Messrs. Stringer-Calvert and Abramson participated for SRI, and Messrs. Bowen and Petty, Ms. Burks and Mr. Walmack, one of ISS's intellectual property valuation consultants, participated for ISS. [Abramson Decl., ¶ 15.] During the teleconference the parties discussed various economic parameters of potential license arrangements such as lump-sum, running royalty and other licensing models. Id. Although the parties remained apart on the numbers, Mr. Bowen agreed to discuss the matter further with ISS's Chief Financial Officer. Id.

On July 28, 2004, Mr. Bowen of ISS and Mr. Abramson of SRI had a cordial meeting over breakfast at which they discussed how to create a licensing structure that would be mutually beneficial. [Abramson Decl., ¶ 17.] At the meeting Mr. Bowen expressed ISS's belief that it did not infringe SRI's patents. Id. Mr. Abramson responded that SRI had conducted an infringement analysis of certain ISS products and had concluded that ISS did, in fact, infringe. Id. Mr. Abramson suggested that SRI would be willing to share its infringement analysis if ISS would explain why it believed its products did not infringe. Id.

During the meeting of July 28, Mr. Bowen asked whether SRI, as a not-for-profit research institute, would actually file a patent infringement suit. [Abramson Decl., ¶ 17.] Mr. Abramson responded that SRI files infringement suits very infrequently, but would file suit if appropriate. Id. Mr. Abramson did not indicate that SRI would, or had any intention to, sue ISS. Id.

At the conclusion of the July 28 meeting, the parties agreed that SRI's and ISS's business negotiations would proceed along two parallel tracks. [Abramson Decl., ¶ 19.] On one track, the parties would work out a process by which SRI would disclose its patent infringement claim charts to ISS showing how ISS infringed SRI's patents. Id. At the same time, ISS would explain why it believed it did not infringe. Id. On a parallel track, the parties agreed to set a meeting or conference call between the scientists responsible for the creation of SRI's intrusion detection and prevention

7

technology and ISS's principal software engineers. Id. The purpose of this technical

meeting would be to determine whether, in addition to the proposed patent license,

SRI had additional technology that might add value to ISS's products under a larger

licensing arrangement. Id.

On August 12, 2004, the parties met telephonically to discuss the exchange of

the parties' contentions on infringement. [Abramson Decl., ¶ 22.] Although

Mr. Bowen at the July 28, 2004 meeting had indicated that the exchange of

infringement positions would be reciprocal, Mr. Petty on August 12 made it clear that

ISS was not prepared to disclose its non-infringement position. Id. Nevertheless,

Mr. Petty expected SRI to disclose its infringement analysis unilaterally, a proposal

that SRI found to be objectionable. Id. Mr. Petty then agreed to consider, but not

commit to, presenting ISS's non-infringement position following a prior disclosure of

SRI's infringement position. Mr. Abramson agreed to consider this proposal. Id.

Despite the momentary delay on the exchange of infringement positions, the parties

agreed to move the ball forward along the second track agreed to at the July 28, 2004

meeting between Mr. Bowen and Mr. Abramson. The parties tentatively scheduled

an August 20, 2004 meeting between SRI's and ISS's technical personnel to discuss

how SRI's technology could add value to ISS's products. [Abramson Decl., ¶ 21.]

Mr. Bowen later confirmed the exact time of the proposed August 20, 2004 technical

meeting in an email on August 13, 2004. [Exh. K.]

On August 20, 2004, Mr. Abramson participated in the conference call with a number of technical and business representatives of ISS and SRI. [Abramson Decl., ¶ 24.] Mr. Bowen, Keith Thompson, ISS's Vice President of Engineering and Chief Technical Officer, and two additional ISS engineers attended for ISS. Id. Mr. Abramson, Mr. Stringer-Calvert and Phil Porras and Al Valdes, two senior scientists, attended for SRI. Id. King & Spalding, which has become ISS's litigation counsel, did not participate in the conference call. Id.

During the conference call, which lasted approximately 40 minutes, Messrs. Porras and Valdes answered questions about SRI's intrusion detection technology, including questions relating to how it functioned, how fully developed it was, and its development history. [Abramson Decl., ¶ 24.] ISS's engineers asked for further technical details regarding SRI's technology and Mr. Porras offered to provide them with copies of various papers written by SRI scientists. Id.

Later on the afternoon of August 20, 2004, David Stringer-Calvert of SRI provided the requested papers to ISS's counsel by email. [Exh. L.] In the email, Mr. Stringer-Calvert confirmed the parties' intention to follow-up the August 20 call with a call on August 25, 2004 between Mr. Bowen and Mr. Abramson. Id.

On August 24, 2004, SRI learned through a third party that ISS had filed the instant declaratory judgment action in the United States District Court for the

Northern District of Georgia on *August 17, 2004*.[3] [Abramson Decl., ¶ 26.] SRI was

shocked to learn of ISS's complaint in view of the apparently cordial, ongoing

technical and licensing discussions between SRI and ISS exemplified by the August

20, 2004, discussions that occurred *three days after the complaint had been filed.* Id.

At no time during the August 20, 2004 meeting, while soliciting technical

information about the operation of SRI's intrusion detection technology as well as

information about when that technology had been developed, did ISS even hint that it

had filed suit. Id. SRI, of course, was surprised by ISS's conduct given that SRI and

ISS were engaged in continuing and active licensing negotiations, which had not

broken down, and neither ISS nor SRI had done anything suggesting that either party

was losing interest in the negotiations. Id.

Perhaps even more telling was Mr. Bowen's behavior at the parties' previously

scheduled August 25, 2004 teleconference with Mr. Abramson. Id. During this call,

Mr. Bowen indicated that in order to push negotiations forward, SRI should provide

ISS with its infringement position as previously suggested. [Abramson Decl., ¶ 27.]

Mr. Abramson, who in order to see what Mr. Bowen might say had not revealed his

recent knowledge of the declaratory judgment action filing, responded that SRI not

---

[3] ISS did not serve its Complaint until September 1, 2004, apparently hoping that it could gain additional information about SRI's technology and legal contentions under the pretext of what SRI thought were ongoing licensing negotiations.

only did not want to disclose its infringement position unilaterally, but also feared that doing so might be used by ISS to attempt to justify an action for declaratory relief. Id. Only after Mr. Abramson voiced his concern about a potential declaratory relief action did Mr. Bowen reluctantly admit that ISS had already filed a Declaratory Judgment action "last week" in order to "protect its interests". Id. Mr. Abramson expressed SRI's unhappiness that ISS would continue to solicit information from SRI, under the guise of licensing negotiations, after secretly filing a lawsuit. Id. Mr. Bowen sought to reassure Mr. Abramson by insisting that from ISS's point of view, the parties had been and still were involved in licensing negotiations, but that ISS had filed the suit on the advice of its outside counsel simply to "protect its interests." Id.

## III.   LEGAL STANDARD

"The Constitution (article 3, § 2) limits the exercise of the judicial power to 'cases' and 'controversies.'" Aetna Life Ins. Co. of Hartford, Conn. v. Haworth, 300 U.S. 227, 240 (1937). The Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, cannot expand the jurisdictional reach of the federal courts beyond real and substantial cases and controversies. Id. "In the declaratory judgment context, the question in each case is whether the facts alleged, under all of the circumstances show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory

judgment." Sierra Applied Sciences, Inc. v. Advanced Energy Industries, Inc., 363

F.3d 1361, 1372 (Fed. Cir. 2004) (citation omitted).

The Federal Circuit has developed a two-part test to guide the case or

controversy analysis in patent-based declaratory judgment suits.[4] In order for a

district court to have jurisdiction over a patent declaratory judgment matter,

> [t]here must be both (1) an explicit threat or other action by the
> patentee, which creates a reasonable apprehension on the part of the
> declaratory plaintiff that it will face an infringement suit, and
> (2) present activity which could constitute infringement or concrete
> steps taken with the intent to conduct such activity.

Sierra Applied Sciences, Inc., 363 F.3d at 1372. The test for reasonable apprehension

is an objective one. Indium Corp. of America v. Semi-alloys, Inc., 781 F.2d 879, 883

(Fed. Cir. 1985). The plaintiff must have reasonable apprehension at the time the

declaratory judgment action is filed. Id. Since the focus of the jurisdictional inquiry

is on the reasonable state of mind of the plaintiff *at the time the plaintiff files suit*,

events that occur after suit is filed are not considered in determining jurisdiction.

CAE Screenplates, Inc. v. Beloit Corp., 957 F. Supp. 784, 789-90 (E.D. Va. 1997)

(". . . all facts learned by the plaintiff subsequent to the commencement of the

---

[4] Whether a case or controversy exists for declaratory judgment actions based on
patent law is governed by the law of the Federal Circuit. Shell Oil Co. v. Amoco
Corp., 970 F.2d 855, 888 fn.4 (Fed. Cir. 1992); Farmaceutisk Laboratorium Ferring
v. Solvay Pharmaceuticals, Inc., 25 U.S.P.Q.2d 1344, 1349 (N.D. Ga. 1992)
(applying Federal Circuit law.)

declaratory judgment suit should be accorded no weight in the jurisdictional calculus

. . .") Accordingly, a declaratory judgment plaintiff may not rely on a subsequent

infringement suit to show a reasonable apprehension of suit at the time the

declaratory judgment action was filed. West Interactive Corp. v. First Data

Resources, Inc., 972 F.2d 1295, 1297 fn (Fed. Cir. 1992.).

A plaintiff wishing to invoke a court's declaratory judgment jurisdiction bears

the burden of showing a case or controversy exists by a preponderance of the evi-

dence. Shell Oil Co. v. Amoco Corp, 970 F.2d 885, 887 (Fed. Cir. 1992). If a

12(b)(1) motion denies or controverts the pleader's allegations of jurisdiction, the

movant is deemed to be challenging the factual basis for the court's subject matter

jurisdiction. Cedars Sinai Medical Center v. Watkins, 11 F.3d 1573, 1583 (Fed. Cir.

1993). In such a case, the allegations of the complaint are not controlling. Id.

## IV.  ARGUMENT

### A.  The court lacks jurisdiction to hear ISS's complaint because ISS had no reasonable apprehension that it was facing an imminent infringement suit.

From March 31, 2004 to August 24, 2004, *seven days after ISS filed suit*, SRI

believed and behaved as though it was involved in a good faith and fruitful effort to

license its technology to ISS.  SRI sent ISS copies of art cited in intrusion detection

patent applications to assist with ISS's due diligence. [Abramson Decl., ¶ 8.] SRI

and ISS engaged in numerous meetings with ISS's intellectual property valuation

consultants present. [Abramson Decl., ¶¶ 10, 15.] SRI placed an offer on the table.

[Abramson Decl., ¶ 11.] ISS responded with a counter offer. Id. The parties worked

to put in place a NDA so that the parties could exchange technical information to

assist the parties in negotiating the value of the license. [Abramson Decl., ¶ 12.]

Negotiations were progressing so well that engineers from ISS and SRI met

telephonically on August 20, 2004, *three days after* ISS filed suit, to discuss SRI's

technology and how it might be integrated into ISS's line of network security

products. [Abramson Decl., ¶ 24.] On August 25, eight days after ISS filed suit,

Mr. Bowen, ISS's general counsel, insisted that negotiations were *still progressing* in

good faith. [Abramson Decl., ¶ 27.]

Despite the overwhelming evidence of good faith negotiations well up to at

least August 24, 2004, when SRI first learned of the suit, ISS, by asserting the

Court's jurisdiction to hear its Complaint, insists that sometime prior to August 17,

2004 it reasonably feared an imminent patent infringement suit. To the extent that

ISS was apprehensive, its apprehension was unreasonable as a matter of law.

"The 'reasonable apprehension of suit' test requires more than the nervous

state of mind of a possible infringer; it requires that the objective circumstances

support such an apprehension." Phillips Plastics Corp. v. Kato Hatsujou Kabushiki

Kaisha, 57 F.3d 1051, 1053 (Fed. Cir. 1995). ISS's behavior and statements do not

support the existence of any such reasonable apprehension. ISS admitted, through its

14

general counsel Mr. Bowen, that ISS considered licensing negotiations to be ongoing

eight days after ISS filed suit. [Abramson Decl., ¶ 27.] According to Mr. Bowen,

ISS filed suit not because ISS was concerned about an infringement suit by SRI, but

only because it was advised to do so for tactical reasons by outside counsel. Id.

ISS's statements and conduct during the period in question reflect a consistent focus

on licensing discussions and the exchange of information relevant to those

discussions. While ISS representatives may have secretly had a "nervous state of

mind," nothing in their objective statements to SRI, much less SRI's statements to

and behavior toward ISS, suggested that licensing talks had broken down or that

litigation was imminent or in any way a foregone conclusion.

SRI's opening communication with ISS, the March 31, 2004 letter, was clearly

an offer to license. In that letter, Mr. Abramson informed ISS, "[w]e intend to

embark on a major licensing program…" and "we would like to discuss approaches

to this situation that have the potential to be mutually beneficial both to ISS and to

SRI." [Exh. A at pages 1-2] An offer to license does not create a reasonable

apprehension of an imminent infringement suit. Phillips Plastics Corp, 57 F.3d at

1053; Dataline, Inc. v. MCI Worldcom Network Services, Inc., No. 00 CIV. 1578

LAP, 2001 WL 102336 at *5-6 (S.D.N.Y. 2001).

Moreover, the Federal Circuit has made clear that, "[w]here there are proposed

or ongoing licensing negotiations, a litigation controversy does not normally arise

until the negotiations have broken down." Phillips Plastics Corp., 57 F.3d at 1053.

In this case, licensing negotiations were ongoing until at least August 24, 2004, when

SRI learned that ISS had filed suit. In fact, even on August 25, more than a week

after it filed suit "to protect its interests," ISS was still insisting that licensing

negotiations were ongoing. [Abramson Decl., ¶27.] Even if genuine, ISS's subjective

feeling that it had to "protect its interests" did not create subject matter jurisdiction

over this complaint at the time it was filed. Under the law of the Federal Circuit, no

case or controversy existed on August 17.

ISS also alleges that SRI expressed a willingness to enforce SRI's patents.

(Complaint ¶ 12). However, as a matter of law, expressing a willingness to enforce

one's patents in the context of a licensing negotiating is insufficient to create a

reasonable apprehension of suit. Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 889

(Fed. Cir. 1992). In Shell Oil, during licensing negotiations, the declaratory

judgment plaintiff asked the defendant patentee if the patentee intended to enforce its

patent. Id. at 889. The patentee responded "yes". Id. The Shell Oil court found that

a positive response in the context of a licensing negotiation was "obligatory". The

Court stated, "[t]o have answered 'no' would have potentially given Shell free reign

to infringe Amoco's patent. If Amoco wanted to continue to negotiate a license with

Shell, its response was necessary." Id. See also, EMC Corp. v. Norland Corp., 89

F.3d 807, 811 (Fed. Cir. 1996) ("No patent owner with any sense would open

16

negotiations by assuring his opposite party that he does not intend to enforce his

patent rights under any circumstances.")

If anything, SRI's treatment of the enforcement issue was less assertive than

that of the patentee in Shell Oil. When asked by Mr. Bowen at the July 28 meeting

over breakfast whether SRI *would ever* file suit, Mr. Abramson replied that SRI filed

suit rarely and would only enforce a patent under appropriate circumstances.

[Abramson Decl., ¶ 18.] His response was far more equivocal, and far less

threatening, than the response found in Shell Oil not to support jurisdiction.[5]

SRI's statements that ISS's products "infringed" SRI's patents are also not

enough to create a reasonable apprehension, although early Federal Circuit authority

may suggest otherwise, specifically Arrowhead Industrial Water, Inc. v. Ecolochem,

Inc., 846 F.2d 731 (Fed. Cir. 1988). The instant case, however is distinguishable

from Arrowhead. In Arrowhead, the declaratory judgment defendant Arrowhead

engaged in an extensive pattern of threatening activity. In addition to making an

express charge of infringement, Arrowhead also demanded the plaintiff stop using the

---

[5] Whether Mr. Abramson's statement rose to the level of an express statement of
willingness to sue ISS (which it did not) is ultimately immaterial. A patentee is
allowed to express a willingness to enforce its patents in the context of a licensing
negotiation without creating a reasonable apprehension of suit. To deny SRI the
right to make such a statement would deprive SRI of its ability to negotiate
adequate compensation for use of its intellectual property. Tying one party to a
licensing negotiation's hands behind its back is not the purpose of the Declaratory
Judgment Act. See, EMC Corp., 89 F.3d at 809.

accused process, stated it "has in the past not hesitated to protect its patent rights whenever possible", and sent a letter to the plaintiff expressing its intent to enforce its patents by litigation. Id. at 733, 737. Further, and most importantly, prior to the filing of the complaint, Arrowhead threatened one of the patentee's customers and actually sued another party on the patents at issue, directly impacting the plaintiff's immediate financial interests. Id. at 733. ISS can point to no such threatening conduct or litigation history here, and SRI never contacted or threatened to contact ISS's customers. Unlike the situation in Arrowhead, SRI's conduct inflicted no financial or business harm that could be ameliorated solely by the filing of a declaratory judgment action. Id., at 734-35.

Cases since Arrowhead demonstrate that it is the act of *threatening suit*, not merely stating a belief that the declaratory judgment plaintiff infringes, that gives rise to reasonable apprehension. See, Cygnus Therapeutics Systems v. Alza Corp., 92 F.3d 1153, 1159 (Fed. Cir. 1996) *overruled on other grounds by* Nobelpharma AB v. Implant Innovations, 141 F.3d 1059, 1068 (Fed. Cir. 1998) (finding no reasonable apprehension where the patentee did not threaten an infringement suit.) There was no such aggressive behavior on the part of SRI in this case. Indeed SRI behaved at every stage in a manner suggesting that it wanted to avoid litigation, as evidenced by its willingness to engage in detailed legal and technical discussions with ISS, the last occurring three days after ISS secretly filed suit.

The proper standard for assessing declaratory judgment jurisdiction has also been further clarified by subsequent Federal Circuit decisions. In <u>Shell Oil</u>, for example, the Court found no reasonable apprehension where, in the context of ongoing licensing negotiations, the patentee stated that the plaintiff's activities "fall within" the patent's claims. <u>Shell Oil</u>, 970 F.2d at 888. Similarly, in <u>Phillips Plastics</u>, the court found no reasonable apprehension despite the patentee's statements that the plaintiff's fasteners "were covered by" the claims of the patent. <u>Phillips Plastics Corp.</u>, 57 F.3d at 1052. <u>See also</u>, <u>EMC Corp.</u>, 89 F.3d at 812 (looking to whether the patentee had expressed a willingness to turn the matter over to litigation counsel for action rather than "magic words" exchanged between the parties.) To the extent that SRI did make an express charge of patent "infringement", the more recent Federal Circuit law is clear that such statements are condoned in the negotiation process as the mere "jawboning" to be expected of any patentee trying to drive a fair bargain. <u>Shell Oil Co.</u>, 970 F.2d at 889.

Accordingly, nothing SRI did during the course of negotiations with ISS could have given rise to a reasonable apprehension of suit. ISS prematurely filed its complaint solely for tactical litigation reasons. Based on the totality of the circumstances, the Court does not have jurisdiction to hear this dispute. ISS's complaint must be dismissed.

**B.**    **If the Court is inclined to conclude that subject matter jurisdiction may exist, it should still decline to exercise its jurisdiction in this case.**

Simply because there may be an actual controversy between the parties sufficient to support jurisdiction does not mean that the district court is required to exercise that jurisdiction. EMC Corp., 89 F.3d at 813. The exercise of declaratory judgment jurisdiction is discretionary. Wilton v. Seven Falls Co., 515 U.S. 277 (1995). The Court should entertain an action only when doing so would further the purposes of the Declaratory Judgment Act. EMC Corp., 89 F.3d at 813-14. To allow ISS to use the resources of the judicial system as a tool to enhance its bargaining position with SRI would not further the purposes of the Act.

On almost precisely the facts here, the Federal Circuit has advised District Courts to decline to exercise jurisdiction over declaratory judgment actions. SRI's interactions with ISS could have been lifted virtually verbatim from the opinion in EMC Corp. v. Norland Corp., 89 F.3d 807 (Fed. Cir. 1996). In EMC Corp. the plaintiff EMC was a manufacturer of disk drive storage subsystems. The patentee was not a competitor, but rather, the owner of four patents in EMC's field. The patentee, Norland, as part of an industry wide effort at licensing its patents, approached EMC about a license. After confirming the fourth meeting between itself and Norland in the course of ongoing license negotiations, the plaintiff EMC filed for declaratory judgment of non-infringement and invalidity. To explain its sudden

decision to file suit in the midst of licensing negotiations, EMC left a telephone message that its management "thought it was in their interest to protect themselves [by filing suit] and continue discussions." EMC Corp., 89 F.3d at 809.

In EMC Corp, the Federal Circuit first noted that the patentee had been aggressive enough to create a sufficient controversy between the parties to confer subject matter jurisdiction.[6] However, after determining that the District Court had subject matter jurisdiction, the Federal Circuit upheld the District Court's decision not to exercise that jurisdiction. In determining that the exercise of jurisdiction under the facts of EMC Corp. would not serve the purposes of the Declaratory Judgment Act, the Federal Circuit noted that the plaintiff was using the Act as a tool to gain bargaining leverage in licensing negotiations with the patentee. EMC Corp., 89 F.3d 813. The Court noted that Norland was engaged in negotiations with EMC Corp.'s competitors, and that by tying Norland's patents up in litigation through the declaratory judgment action, EMC Corp. damaged Norland's negotiating position vis-à-vis EMC's competitors. Id. at 815. According to the Federal Circuit, such use of a declaratory judgment action as a "tactical measure" was rightly rejected by the District Court.

---

[6] The Court based its finding of subject matter jurisdiction on the patentee's manifest willingness to refer the matter to litigation counsel "for action" in the event that its license terms were not agreed to. EMC Corp. 89 F.3d at 812. In this case, SRI made no such representation to ISS.

As in EMC Corp., SRI is not a competitor of ISS.  SRI advised ISS of its

intention to engage in industry-wide licensing negotiations regarding its patents, and

further advised ISS that it was in fact engaged in such discussions with another

company. [Abramson Decl., ¶ 2.]  SRI offered early potential licensees like ISS the

opportunity to negotiate for exclusive rights.  In an apparent attempt to forestall a

possible exclusive license to any other competitor in ISS's market, ISS sought to tie

up SRI's patents in litigation through the filing of the instant suit.  As in EMC Corp.,

this is not an appropriate use of a declaratory judgment action.[7]

The instant case is also somewhat similar to the situation faced by the

defendant in Charles Machine Works, Inc. v. Digital Control, Inc., 264 F. Supp. 2d

980 (W.D. Olka. 2003).  In Charles Machine Works, the patentee DCI approached the

declaratory judgment plaintiff CMW in December, 1997 as part of an industry wide

effort to license patents.  CMW responded in August, 1998 with a letter expressing its

---

[7] Restricting the application of the declaratory judgment procedure to "cases closer to
the central objectives of declaratory judgment proceedings," EMC Corp., 89 F.3d
807, is also consistent with the important social interest in encouraging settlements
and conserving scarce judicial resources. "[I]t would be inappropriate to reward—
and indeed abet—conduct which is inconsistent with the sound policy of promoting
extrajudicial dispute resolution and, and conservation of judicial resources." Id. at
814 quoting Davox Corp. v. Digital Systems Intl. Inc., 846 F. Supp. 144, 148 (D.
Mass. 1993).  If a patentee cannot discuss license terms with a potential licensee
without being sued for declaratory relief in a distant and inconvenient forum, it will
have no choice but to sue first and talk second. Such an outcome, which promotes
litigation and burdens the courts, is obviously undesiredable from a social policy
perspective.

belief that DCI's patents were invalid. Over the next four years, DCI sued several manufacturers of drilling head equipment. Concerned about DCI's pattern of enforcing its patents and relying on hearsay statements about DCI's willingness to sue CMW, CMW filed a declaratory judgment action on October 11, 2002. CMW did not serve their complaint on DCI.

Three days later, on October 14, 2002, representatives of CMW contacted DCI about a possible licensing arrangement. Negotiations between the two companies began in December 2002 and continued for the next three months until DCI learned of the declaratory judgment suit and filed a motion to dismiss CMW's complaint for lack of subject matter jurisdiction.

Under these facts, the <u>Charles Machine Works</u> Court found no subject matter jurisdiction, but went on to explain why it would not have entertained jurisdiction over the matter even if it had found an actual controversy. In a strongly worded condemnation of CMW's behavior, the Court noted,

> For ... three months [after the suit was filed], the parties moved forward with licensing negotiations, which included personal meetings and written proposals. All the while, CMW was secretly holding its filed but unserved complaint in its pocket, ready for use if negotiations failed. CMW maintains that its silence was necessary to avoid disrupting the negotiation process or appearing to use the litigation as leverage. Silence is one thing; deceit is another. CMW did not simply keep silent. It instead engaged in a deliberate ruse, pretending that it wanted an amicable resolution of patent issues when in fact it had already filed suit.

Charles Machine Works, Inc., 264 F. Supp. 2d at 889; see also, Lyons Industries, Inc. v. American Standard, Inc., 993 F. Supp. 609, 615 (W.D. Mich. 1997).

ISS engaged in a similar deceit in this case, secretly filing but not serving a declaratory judgment action three days before participating in a previously-scheduled conference call between the parties' technical representatives to discuss the subject matter of a potential license while never disclosing that it had already filed suit against SRI. Such misbehavior should not be countenanced or rewarded by the Court. ISS has attempted to use the Declaratory Judgment Act as a tactical tool for gaining advantage in licensing negotiations. In view of SRI's demonstrated willingness at the time to resolve this matter amicably through a license, the Court should not condone ISS's willingness to waste judicial resources for its own commercial advantage. See, Waters Corp. v. Hewlett-Packard Co., 999 F. Supp. 167, 174 (D. Mass. 1998).

Moreover, it is important to point out that ISS's decision to file a secret lawsuit and then to continue to behave as if good faith negotiations were ongoing suggests something more than merely an attempt to gain commercial advantage. ISS's strategy appears to have been to use the license discussion process to obtain further information about SRI's infringement positions and about the operation and origin of SRI's technology. ISS's apparent strategy to build its non-infringement and invalidity case while pretending to be engaged in an earnest effort to forge a

commercial relationship with SRI strongly suggests bad faith. Who knows how long

the talks may have gone on and what other advantage ISS might have gained had SRI

not independently discovered the Complaint? Independent of the direction of the

Federal Circuit, which on these facts is clear, SRI submits that ISS's demonstrated

lack of good faith in the course of its post-filing negotiations with SRI should lead the

Court to decline to exercise jurisdiction over ISS's complaint.[8]

## V.    CONCLUSION

For the forgoing reasons, SRI requests that the Court find it lacks subject

matter jurisdiction and dismiss ISS's complaint. To the extent that the Court finds

that it has jurisdiction, SRI requests that the Court exercise its discretion to decline to

exercise that jurisdiction and dismiss ISS's complaint as a matter of judicial

discretion.

Dated: September 20, 2004

John L. North (GA Bar No. 545580)
Ann G. Fort (GA Bar No. 269995)
Sutherland Asbill & Brennan LLP
999 Peachtree Street, N.E.
Atlanta, Georgia 30309

---

[8] ISS will get its day in court. After discovering that ISS was using SRI's willingness to negotiate in good faith to ISS's unfair advantage, SRI filed and served a complaint for patent infringement in the District of Delaware on August 30, 2004. [Abramson Decl., ¶ 28.] In the event that this Court should find and exercise subject matter jurisdiction over this matter, SRI will move the Court to transfer this case to the District of Delaware, in part to alleviate any unfair advantage to ISS and to allow the matter to proceed in SRI's chosen forum.

Telephone: (404) 853-8000
Facsimile: (404) 853-8806

Howard G. Pollack (CA Bar No. 162897)
Michael J. Curley (CA Bar No. 230343)
500 Arguello Street, Suite 500
Redwood City, California 94063
Telephone: (650) 839-5070
Facsimile: (650) 839-5071

Attorneys for Defendant
SRI INTERNATIONAL, INC.

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1D, the undersigned counsel hereby certifies that the foregoing **SRI INTERNATIONAL, INC.'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) AND MEMORANDUM IN SUPPORT** complies with the font and point selections approved by the Court in LR 5.1B. The foregoing Memorandum was prepared on a computer using the Times New Roman font (14 point).

ANN G. FORT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

INTERNET SECURITY SYSTEMS,
INC., a Georgia Corporation,

      Plaintiff,

      v.

SRI INTERNATIONAL, INC., a
California Corporation,

      Defendant,

Civil Action No. 04-CV-2402-CC

## CERTIFICATE OF SERVICE

The undersigned counsel of record hereby certifies that on September 20,

2004, a copy of the within and foregoing **SRI INTERNATIONAL, INC.'S**

**MOTION TO DISMISS PURSUANT TO RULE 12(b)(1) AND**

**MEMORANDUM IN SUPPORT** was served upon counsel for Plaintiff, properly

addressed as designated below:

## VIA HAND DELIVERY

Holmes J. Hawkins, III
Natasha Horne Moffitt
King & Spalding
191 Peachtree Street N.E.
Atlanta, GA  30303-1763

Attorneys for Plaintiff
Internet Security Systems, Inc.

ANN G. FORT